## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**CLEVE ROBERT REID,**

        **Plaintiff,**

v.                                 **Civil Action No. 2:18-cv-563**

**ANDREW SAUL,**
**Commissioner of Social Security,[1]**

        **Defendant.**

### REPORT AND RECOMMENDATION

Plaintiff Cleve Robert Reid ("Reid") seeks judicial review of the Commissioner of Social Security's ("Commissioner") decision denying his claim for disability insurance benefits ("DIB") under the Social Security Act. Reid claims that the Administrative Law Judge ("ALJ") failed to give appropriate weight to his treating physicians' opinions and mischaracterized evidence related to the extent of his limitations. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B), and Rule 72(b) of the Federal Rules of Civil Procedure. This Report concludes that the ALJ did not err in evaluating the medical evidence and thus recommends that the final decision of the Commissioner be affirmed.

### I. Procedural Background

Reid filed an application for DIB on February 20, 2015, alleging a disability onset date of July 18, 2011. (R. at 90, 186.) The Commissioner denied his application on May 8, 2015. (R. at

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019, and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). See also section 205(g) of the Social Security Act, 42 U.S.C § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

90-99.) Reid requested an administrative hearing and received one on March 29, 2017. (R. at 33, 123.)

The ALJ determined that Reid was not disabled within the meaning of the Social Security Act and denied his claim for benefits. (R. at 14-28.) The Appeals Council declined to review the ALJ's decision, (R. at 1-3), making the ALJ's decision the final decision of the Commissioner. Reid timely filed this action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). This case is now before the court in order to resolve the parties' cross-motions for summary judgment.

## II. Factual Background

Reid, forty-five years old on his alleged onset date, (R. at 91), has a sixth-grade education and previously worked as a dishwasher and automobile dismantler, (R. at 204). Reid has not worked since the alleged onset date in 2011 when he states he was falsely accused of stealing from his employer. (R. at 37-39, 203.) At the hearing before the ALJ, Reid testified that this false accusation, and subsequent police questioning, caused him to develop such severe anxiety and psychological distress that he could no longer maintain employment. (R. at 37-39, 53.) Merely being around other people in public or hearing police sirens would trigger panic attacks. (R. at 53, 55.) After leaving his job, Reid applied for and received workers' compensation benefits. (R. at 40, 42.) As a condition of continued receipt, Reid attempted to find other work but was unsuccessful. (R. at 40, 50, 54.) However, Reid testified that, because of his illness, he would not have been able to work even if he had received any offers. (R. at 54.)

On July 6, 2012, Reid went to the Richmond University Medical Center ("RUMC") in New York for a mental health evaluation. (R. at 283-84, 303.) During the assessment, Reid stated that he suffered from chronic anxiety, depression, and insomnia. (R. at 303-04.) He also noted a fear

2

of the police and "difficulty coping with being out of work." (R. at 303.) Reid reported taking Prozac and Ambien for the past year to help manage his symptoms and noted some improvement with his anxiety and depression. (R. at 303-04.) The assessment notes indicate that Reid presented a calm demeanor, a slightly anxious mood, and a linear thought process. (R. at 305.) The examining doctor diagnosed Reid with anxiety, (R. at 305), referred him to the St. George Outpatient Clinic ("St. George") for mental health treatment, (R. at 283-84), and recommended he continue taking his medication, (R. at 305).

According to the record, Reid began treatment at St. George on July 12, 2012. (R. at 283-84, 286.) The treatment consisted of weekly psychotherapy with Michele Rubin, L.C.S.W., and monthly medication management with John Naliyath, M.D. (R. at 280-82, 284, 286, 342-88.) The record, however, contains St. George treatment notes only from August 2013 to April 2014. (R. at 342-88.) These particular treatment notes reveal overall improvement in Reid's condition, particularly with medication. For example, on October 24, 2013, Reid complained of worsening anxiety and poor sleep, so Dr. Naliyath prescribed increased dosages of fluoxetine (Prozac) and Ambien. (R. at 344-45, 366-67.) On October 30 and November 13, Ms. Rubin noted that Reid presented with a sad and "somewhat anxious" mood. (R. at 346-47, 365, 384.) Reid reported that he experienced difficultly sleeping, increased anxiety, and a decrease in appetite. (R. at 346-47, 365, 384.) Reid attributed these symptoms to being out of work and his pending workers' compensation "case."[2] (R. at 346-47, 365, 384.) With a few exceptions, from November 21, 2013, to April 28, 2014, Reid reported improvement in his mood and sleep with medication.[3] (R. at 326,

---

[2] Reid made a similar report to Ms. Rubin on December 4. (R. at 350, 364.)
[3] On April 30, 2014, however, Reid complained of sleep disturbance, mood swings, anxiety and depression. (R. at 342.)

348-60, 362-64, 369-83.)  Likewise, Ms. Rubin observed that Reid presented with a neutral mood and coped adequately with his stressors.[4]  (R. at 350-51, 354, 358, 364, 369, 376, 380.)

In March 2014, Howard M. Rombom, Ph.D., performed a psychological evaluation of Reid.  (R. at 275-79.)  Reid reported psychological distress, disturbing memories, difficulty sleeping, and feeling disconnected from other people.  (R. at 275-77.)  Dr. Rombom found that Reid's anxiety "may significantly interfere with the activities of daily living and result in poorly planned responses to routine tasks and activities.  (R. at 277.)  Dr. Rombom diagnosed him with post-traumatic stress disorder ("PTSD") and major depressive disorder ("MDD").  (R. at 278-79.)

In May 2014, Reid began treating with Christina Vaglica, D.O., in relation to his workers' compensation claim.  (R. at 327-341.)  At the first appointment, Reid complained of nightmares and flashbacks relating to the theft accusations and police questioning.  (R. at 340.)  He also noted that he experienced anxiety when seeing police and hearing police sirens.  (R. at 340.)  Dr. Vaglica's mental status examination reveals that Reid presented with a depressed and anxious mood but otherwise exhibited intact judgment, fair to good concentration, and coherent, goal-directed speech.  (R. at 340.)  The treatment notes also state that Reid scored 50 on the Global Assessment of Functioning ("GAF")[5] scale.  (R. at 340.)  Dr. Vaglica diagnosed Reid with anxiety

---

[4] The record contains no St. George treatment notes post April 30, 2014.  On January 31, 2015, St. George discharged Reid, reporting that Reid completed treatment and noting an "[a]melioration of symptoms."  (R. at 343, 361.)

[5] The GAF represents a numeric scale (0 through 100) used by mental health clinicians and physicians to rate the social, occupational and psychological functioning of adults. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000).  A GAF of 71-80 indicates that "if symptoms are present, they are transient and expectable reactions to psycho-social stressors;" a GAF of 61-70 indicates that the individual has "some mild symptoms;" a GAF of 51-60 indicates that the individual has "moderate symptoms;" and a GAF of 41-50 indicates that the individual has "serious symptoms." Id.  However, the DSM-5 abandoned the use of GAF scores as a diagnostic tool for assessing a patient's functioning because of the questionable probative value of such scores.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 16 (5th ed. 2013).

disorder, PTSD, and MDD. (R. at 340.) In her opinion, Reid's symptoms were causally related to the "accident" and resulted in total temporary psychiatric disability. (R. at 340.) Dr. Vaglica also increased Reid's Prozac dosage and started him on Trazdone (in lieu of Ambien) and Klonopin. (R. at 340.)

Reid followed-up with Dr. Vaglica in August, September, November, and the following January and March. (R. at 327-38, 396-98.) The treatment notes for these appointments are substantially similar. Reid reported continued anxiety but noted improvement in his depression due to his wife's support and psychotherapy. (R. at 328, 331, 334, 337, 397.) He further noted therapeutic value in exercise and breathing and imagery techniques. (R. at 328, 331, 334, 337, 397.) In addition, at the January 2015 appointment, Reid stated that he had started taking "basic reading and writing classes to further his education." (R. at 328, 397.) Reid's GAF score remained 50. (R. at 329, 332, 334, 338, 398.) Dr. Vaglica's mental status examination, diagnoses, and opinion remained unchanged.[6] (R. at 328-29, 331-32, 334-35, 337-38, 397-98.)

In September 2015, Reid and his wife moved from their New York residence to Virginia, where his wife's family lived. (R. at 40.) Reid testified that he wanted to get away from the city and live in a quieter area. (R. at 40.) Despite the move, however, Reid continued to treat with doctors in New York, traveling by bus. (R. at 44.) From January 2016 to February 2017, Reid traveled to New York approximately once a month to treat with Dr. Vaglica, (R. at 416-48), and Stephen D. Schwabish, Ph.D., a colleague of Dr. Rombom's, (R. at 449-71).[7] Dr. Vaglica's treatment notes, which are markedly similar, reflect that Reid continued to complain of depression

---

[6] At the March 2015 appointment, Dr. Vaglica changed her opinion of total temporary psychiatric disability to total psychiatric disability. (R. at 398.)
[7] Although the record does not contain any treatment notes from Dr. Schwabish before January 2016, the record indicates that Reid began regularly seeing Dr. Schwabish shortly after he treated with Dr. Rombom in March 2014. (R. at 339, 452.)

and anxiety.  (R. at 417, 420, 423, 426, 429, 432, 435, 438, 441, 444, 447.)  Reid reported that he

had been walking and exercising, gardening, and utilizing breathing and imagery techniques.  (R.

at 417, 420, 423, 426, 429, 432, 435, 438, 441, 444, 447.)  These activities combined with his

wife's support, psychotherapy, and medication helped him cope with his anxiety and depression.

(R. at 417, 420, 423, 426, 429, 432, 435, 438, 441, 444, 447.)  From January to August, Reid noted

reduced anxiety when outside his house.  (R. at 417, 420, 423, 426, 429, 432.)  But in September,

Dr. Vaglica recorded that Reid suffered from a paranoid ideation that "others are after him, out to

get him."  (R.at 435.)  This fear often prevented him from venturing outside his house, except to

attend church occasionally and visit his wife's family.  (R. at 435.)

       In December 2016 and January 2017, Reid reported an "increase in anxiety with no

identifiable trigger."  (R. at 441, 444.)  Dr. Vaglica increased Reid's Klonopin dosage.  (R. at 442.)

Reid followed-up with Dr. Vaglica again in February.  (R. at 446-48.)  Reid reported that he had

been off Prozac and Trazodone for the past month "due to lack of authorization."  (R. at 447.)  As

a result, Reid reported an increase in anxiety, depression, and insomnia.  (R. at 447.)  Reid also

stated, and his wife confirmed, that he had experienced an increase in mood swings.  (R. at 447.)

At each appointment with Dr. Vaglica for the 2016-2017 period, Dr. Vaglica consistently recorded

that Reid presented with a depressed and anxious mood and had a GAF score of 50.  (R. at 418,

420-21, 423-24, 426-27, 429-30, 432-33, 435-36, 438-39, 441-42, 444-45, 447-48.)  In addition,

she observed that Reid demonstrated intact judgment and memory, fair to good concentration, and

coherent, goal-directed speech.  (R. at 418, 421, 424, 427, 429-30, 432-33, 435-36, 438, 441, 444,

447-48.)

       The record also contains treatment notes by Dr. Schwabish for the same period.  (R. at 452-

71.)  In January, Reid reported that he was "doing well," enjoyed the "more rural lifestyle," and

found "some solace in working in his yard." (R. at 453.) He also remarked positively about his breathing and imagery techniques. (R. at 453.) At his next appointment in March, Dr. Schwabish recorded that Reid was distressed about the recent death of his son. (R. at 455.) Otherwise, Reid stated that he enjoyed living in Virginia and continued benefitting from his coping exercises. (R. at 455.) From April to August, Reid indicated that he generally felt better and happier. (R. at 456, 458, 460, 462.) Likewise, Dr. Schwabish noted that Reid looked well and appeared to be enjoying his new life in Virginia. (R. at 456, 458, 460, 462.) In particular, the May treatment notes state that Reid was "generally able to separate sight of security personnel, sounds of alarms, etc., from intrusive thought that people are after him" and "seems to have been able to appreciably lessen the impact of these disturbing thoughts." (R. at 458.) However, from October to the following February, Reid stated that he continued to suffer from "purging thoughts" that the authorities were after him.[8] (R. at 464, 466, 468, 470.) Although Dr. Schwabish specified that Reid's fears presented on "a much lower level than when therapy initially began," (R. at 466), he noted that such fears tended to prevent Reid from going to public places. (R. at 466, 468, 470.) The record does not contain any further treatment notes before the ALJ hearing in March 2017.

In addition to the treatment notes, Reid produced six medical source statements – five prepared by Dr. Vaglica, (R. at 389-95, 401-04,[9] 407-08, 411-12), and one prepared by Dr. Schwabish, (R. at 405-06, 409-10).[10] The first appears to be dated April 15, 2015, and was

---

[8] In fact, Dr. Schwabish recorded that Reid's condition had worsened between December 2016 and January 2017. (R. at 468.)

[9] The medical source opinion located on pages 401-02 of the record does not include the opining doctor's name in print under the signature line. However, the signature and handwriting on that particular opinion appears to be Dr. Vaglica's as it is fairly consistent with the signature and handwiting that appears on other medical source opinions that Dr. Vaglica indisputably authored.

[10] "Dr. Howard M. Rombom" appears in print under the signature line, but Dr. Schwabish's signature appears on the signature line. (R. at 406, 410.)

completed by Dr. Vaglica. (R. at 389-95.) She opined that Reid's PTSD, social anxiety, and depression prevented him from "function[ing] in [a] work setting" and performing "work related mental activities." (R. at 389, 393.) The second appears to be dated May 27, 2016, and seems to be authored also by Dr. Vaglica. (R. at 401-02.) It opines that Reid's symptoms "impair [his] ability to interact with co-workers, supervisors[,] or customers." (R. at 401.) It further states that Reid possessed poor or no ability to understand and carry out complex or detailed job instructions; to deal with work stresses; and to maintain concentration. (R. at 401-02.) But Reid had fair ability to understand and carry out simple job instructions; function independently; and follow work rules. (R. at 401-02.)

The third medical source opinion authored by Dr. Vaglica, dated February 14, 2017, reiterates that Reid continued to suffer from PTSD, anxiety, depression, insomnia, and panic attacks, all of which prevented Reid from functioning in a work setting. (R. at 403-04.) Dr. Vaglica's fourth and fifth medical source opinions, dated February 21, 2017, and March 2, 2017, respectively, essentially restate the same information and reach the same conclusions as her previous opinions. (R. at 407-08, 411-12.)

Dr. Schwabish also prepared a medical source statement.[11] (R. at 405-06, 409-10.) He opined that Reid's symptoms, particularly his intrusive thoughts and hypervigilance, "have negatively impacted [his] functioning" and "ability to perform in a work environment." (R. at 405, 409.) He further opined that Reid possessed poor to no ability to interact with supervisors, co-workers, and the public; to deal with work stresses; and to understand and perform complex job instructions. (R. at 405-06, 409-10.) However, Reid had a fair ability to understand and carry out

---

[11] The record contains two medical source opinions authored by Dr. Schwabish. (R. at 405-06, 409-10.) Upon closer examination, however, the two opinions are identical and appear to be copies of the same opinion.

detailed and simple job instructions; to follow work rules; to maintain concentration; and to function independently. (R. at 405-06, 409-10.)

After Reid applied for DIB, S. Shapiro, Ph.D., a state agency psychological consultant, performed an independent assessment of Reid and his limitations in May 2015. (R. at 90-108.) Dr. Shapiro concluded that Reid had three medically determinable impairments: affective disorder (severe), anxiety disorder (severe), and hypertension (non-severe). (R. at 94.) However, Dr. Shapiro found that Reid's impairments did not satisfy the criteria for the relevant Social Security impairment listings – 12.04 (affective disorders) and 12.06 (anxiety-related disorders). (R. at 95.) He found Reid's complaints of psychiatric distress credible but "not to the extent alleged." (R. at 95.) Instead, Dr. Shapiro opined that Reid demonstrated only mild restrictions in activities of daily living and social functioning and moderate difficulty in maintaining concentration, persistence, or pace. (R. at 95.) In addition, he found that Reid's ability to work with others and carry out simple instructions was not significantly limited. (R. at 97.) These findings led Dr. Shapiro to conclude that Reid could perform work activities identical or similar to his prior employment in a "low stress setting." (R. at 95.) According to the ALJ hearing transcript, the Social Security Administration also ordered a consultative examination in 2016, but Reid failed to attend and provided no explanation for his absence. (R. at 50-53.) The ALJ gave Reid's attorney an opportunity to provide explanation after the hearing, (R. at 52-53), but the ALJ's opinion states that no explanation was ever offered. (R. at 17.)

Aside from the medical records, Reid testified at the ALJ hearing. Reid testified that when he still lived in New York, but after he stopped working, he worked out at a local gym three times a week. (R. at 59.) He also attended night classes twice a week at a local learning center to improve his reading ability; sometimes, his wife would take him. (R. at 46-47.) Although he could

9

not specify how long he had been attending these classes, he stated that he had been attending them "for a while."[12]  (R. at 47.)  He also testified that he would perform housework during the day while his wife was at work; that occasionally he and his wife would visit family; and that he would go with his wife to buy groceries.  (R. at 47-48.)  He noted that his medication helped relieve his anxiety.  (R. at 49.)

The ALJ also questioned Reid about his lifestyle and activities after his move to Virginia. Reid testified that he traveled by bus to New York each month to continue treating with his doctors. (R. at 44-46, 49.)  When asked whether he traveled to New York alone, Reid responded that he did sometimes.  (R. at 49.)  Reid also testified that he worked out in his garage of his house.  (R. at 49-50.)  He left his house only a few times a week – sometimes to grocery shop with his wife and sometimes to accompany his wife, who had become disabled at some point, to her medical appointments.  (R. at 42, 55-56.)  Although Reid stated that he still suffered panic attacks each time he left the house, he stated that he had made progress in overcoming and controlling his symptoms.  (R. at 54, 56-57.)

Finally, a Vocational Expert ("VE") also gave testimony at the ALJ hearing.  (R. at 60-65.) When asked hypothetically by the ALJ whether any job existed in the national economy that could be performed by an individual of Reid's age, education, and work experience, and who was limited to working in a low-stress environment and performing simple, repetitive, non-production job tasks that do _not_ involve any of the following: climbing, working at unprotected heights, the

---

[12] One could properly infer from Reid's testimony that he attended these classes for at least a year, if not longer:

    Q      How long did you attend the [learning] center?
    A      I don't know. I couldn't put the months and the years together. I be [sic] there for
                a while.

(R. at 47.)

operation of heavy machinery, exerting more than a medium amount of force, and following written job instructions, the VE responded in the affirmative.  (R. at 60-62.)  Specifically, the VE identified positions as a day worker (DOT #301.687-014), a janitor/industrial cleaner (DOT #381.687-018), a cleaner of housekeeping (DOT #323.687-014), and a laundry worker (DOT #361.687-014), and she noted that none of those positions conflicted with the limitations specified in the ALJ's hypothetical.[13]  (R. at 61-62.)  The VE also opined, however, that sedentary jobs likely were not available given Reid's limited education.  (R. at 61-62.)

On cross-examination, Reid's counsel asked the VE to assume the same hypothetical person with the additional limitations of being unable both to relate with co-workers and interact with a supervisor.  (R. at 63-64.)  The VE testified that under those circumstances, no suitable job existed.  (R. at 63-64.)  However, the VE testified that, notwithstanding the person's ability to relate to co-workers, if he could interact with a supervisor, suitable jobs existed in the national economy – though the number of suitable jobs would be significantly less than that available to person who could also relate to co-workers.  (R. at 64-65.)

### III. Legal Standard

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence in the record and whether

---

[13] The undersigned believes there is an error in the ALJ hearing transcript regarding the ALJ's hypothetical.  According the transcript, the ALJ's hypothetical includes the limitation that the worker "would have frequent interaction with the general public."  (R. at 61.)  However, as explained below, the ALJ's RFC determination in his written opinion includes the limitation that Reid not have frequent interaction with the general public.  (R. at 22.)  It appears that the VE nonetheless understood the ALJ's hypothetical to not involve frequent interaction with the general public as the jobs she proposed are consistent with that limitation.  See Dictionary of Occupational Titles, 301.687-014, 1991 WL 672654; 323.687-014, 1991 WL 672783; 361.687-014, 1991 WL 672991; 381.687-018, 1991 WL 673258 (4th ed., rev. 1991).  In any event, Reid has not raised the sufficiency of the ALJ's hypothetical as grounds for remand.

the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence but may be somewhat less than a preponderance.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)."  Craig, 76 F.3d at 589.  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed.  Perales, 402 U.S. at 390.  Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. Recommended Conclusions of Law

To qualify for DIB under sections 416(i) and 423 of the Social Security Act, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act.  See 42 U.S.C. §§ 416(i), 423.

The Social Security Regulations define "disability" as the:

> Inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

> expected to result in death or which has lasted or can be expected to
> last for a period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§423(d)(1)(A) and 416(i)(1)(A).  To meet this

definition, a claimant must have a "severe impairment" which makes it impossible to do previous

work or any other substantial gainful activity that exists in the national economy.  20 C.F.R.

§ 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all

material facts will be considered in determining whether a claimant has a disability.   The

Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled.

At step one, the ALJ must determine whether the claimant is involved in substantial gainful

activity. 20 C.F.R. § 404.1520(a)(4)(i).  If he is, the claimant is not disabled.  At step two, the ALJ

asks whether the claimant suffers from a severe medical impairment or combination of

impairments that significantly limit his physical or mental ability to do work activities.

§ 404.1520(a)(4)(ii).  If he does not, the claimant is not disabled.  Step three requires the ALJ to

determine whether the medical impairments meet or equal an impairment listed in 20 C.F.R., Pt.

404, Subpt. P, App. 1 (a "listed impairment").  § 404.1520(a)(4)(iii).  If the answer is yes, the

claimant is disabled.  If the answer is no, the ALJ must assess the claimant's residual functional

capacity ("RFC"), which accounts for the most the claimant can do despite his physical and mental

limitations, before proceeding to the next step. § 404.1545(a).  At step four, the ALJ determines

whether the claimant can perform his past work given his RFC.  § 404.1520(a)(4)(iv).  If he can,

he is not disabled.  If he cannot, the ALJ continues to the final step and asks whether the claimant

can perform any work existing in the national economy.  § 404.1520(a)(4)(v).  A negative answer

establishes disability.  However, an affirmative answer results in a finding of no disability.

The burden of proof and production rests on the claimant during the first four steps but shifts to the Commissioner at the fifth step.  Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).  At all steps, the ALJ bears the ultimate responsibility for weighing the evidence.  Hays, 907 F.2d 1456.  Additionally, when conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses and expert medical opinions of treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age.  Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)).

## A.    The ALJ's Decision

In this case, the ALJ issued a written opinion, finding that Reid did not qualify as disabled under the Social Security Act.  (R. at 17-28.)  In arriving at this conclusion, the ALJ employed the five-step analysis set out above.  At step one, the ALJ found that Reid had not engaged in substantial gainful activity since his alleged onset date of July 18, 2011.  (R. at 19.)  At step two, the ALJ concluded that Reid had the following severe impairments: depression, anxiety disorder, and PTSD.  (R. at 19.)  At the third step, the ALJ determined that Reid did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (R. at 20-22.)

Next, the ALJ found that Reid had the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c), except that (1) he was unable to engage in climbing or work at unprotected heights or around dangerous machinery; (2) he was limited to performing simple, repetitive, non-production rate job tasks in a low-stress environment without frequent interaction with the general public; and (3) he was limited to performing work that involved no requirement to follow written

14

job instructions. (R. at 22-26.) In determining Reid's RFC, the ALJ found that Reid's impairments could reasonably cause his alleged symptoms; however, he concluded that Reid's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 23.) In particular, the ALJ noted that Reid's treatment notes, course of treatment, and extensive daily activities established overall improvement in his mental condition. (R. at 23-26.) Accordingly, the ALJ gave only partial weight to Reid's treating physicians' opinions as they were based mostly on Reid's stated symptoms and "overstate[d] the extent of [Reid's] limitations." (R. at 26.)

Given Reid's RFC, the ALJ concluded that although Reid was unable to perform any of his past relevant work, (R. at 26-27), there were jobs that existed in significant numbers in the national economy that Reid could have performed, (R. at 27-28). As a result, the ALJ made a finding of no disability.

Reid advances two arguments for why the court should vacate the Commissioner's decision and remand for a new hearing and decision. First, Reid argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ gave improper proper weight to Reid's treating physicians' opinions. (ECF No. 16, at 7-12.) Second, Reid claims that the ALJ mischaracterized the evidence in order to find that Reid's limitations were less severe in determining whether they met or medically equaled a listed impairment. (Id. at 12-16.) As explained below, the ALJ did not err with respect to the issues Reid asserts. Accordingly, this Report concludes that substantial evidence in the record supports the ALJ's finding of no disability.

**B.     The ALJ Properly Weighed the Opinions of Reid's Treating Physicians in the RFC Determination**

Reid first contends that the ALJ erred in determining Reid's RFC because the ALJ failed to give proper weight to the opinions of Reid's treating sources, Dr. Vaglica and Dr. Schwabish, (ECF No. 16, at 7-12), which state that Reid could not reliably perform in a work-setting, (R. at 389-95, 401-412).   In determining whether the claimant has a medically determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered.   20 C.F.R. §§ 404.1512, 404.1527, 416.912, 416.927.   When the record contains a number of medical opinions from different sources that are consistent with each other, the ALJ is required to use that evidence to make a determination on disability.   20 C.F.R. §§ 404.1527(c), 416.927(c).   If, however, the medical opinions are inconsistent with each other or other evidence, the ALJ must evaluate the opinions and assign them persuasive weight to properly analyze the evidence involved.   20 C.F.R. §§ 404.1527(c)(2)-(6), (d), 416.927(c)(2)-(6), (d).

Ordinarily, a treating source's opinion will be given controlling weight if it is well-supported by medically acceptable diagnostic methodology and not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Lewis v. Berryhill, 858 F. 3d 858, 867 (4th Cir. 2017).   But the ALJ need not accept opinions from a treating source in every situation.   For instance, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence, or when it is not otherwise well-supported, it is due no special deference.   20 C.F.R. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4),

(d); Craig, 76 F.3d at 590 ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."). Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" Dunn v. Colvin, 607 F. App'x 264, 267 (4th Cir. 2015) (quoting Scivally v. Sullivan, 966 F.2d 1070, 1077 (7th Cir. 1992)).  Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded.[14]  See Lewis, 858 F.3d at 868; Dunn, 607 F. App'x at 267.  Because the regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations]."  SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996).

The ALJ must consider the following when evaluating a treating source's opinion:  (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors.  20 C.F.R. §§ 404.1527(c), 416.927(c).  However, those same regulations specifically empower the ALJ – not the treating source – to determine whether a claimant is disabled under the Act.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

---

[14] Effective March 27, 2017, the SSA rescinded 20 C.F.R. §§ 404.1527 and 416.927 and implemented a new rule governing the consideration of medical opinions.  See 20 C.F.R. § 404.1520(c) (2017).  Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them based upon the two most important factors of supportability and consistency.  §§ 404.1520c(a), (c)(1)-(2).  Because the regulation does not have retroactive effect, the Court will review the ALJ's decision under the old rule codified by 20 C.F.R. §§ 404.1527 and 416.927, in effect when Reid filed his claim in May 2015.  Parsons v. Berryhill, No. 3:18cv1107, 2019 WL 2252023, at *10 n.3 (S.D.W. Va. May 2, 2019).

Here, before evaluating Dr. Vaglica and Dr. Schwabish's medical source statements, the ALJ conducted an extensive review of the evidence, including Reid's treatment progress, medication regime, and daily activities. (R. at 22-26.) The ALJ first noted that the treatment notes from 2012 to 2017 reflect overall improvement in Reid's mental health with psychotherapy and medication. (R. at 23-25.) The ALJ discussed the numerous occasions on which Reid reported feeling better and improvement in his depressive symptoms, particularly after his move to Virginia. (R. at 24-25.) In addition, Reid consistently denied experiencing any suicidal ideation, hallucinations, or psychosis. (R. at 24.) The ALJ also explained the variety of activities that Reid engaged in, including exercising, landscaping, gardening, taking his disabled wife to appointments, and traveling to New York by bus each month for his own psychiatric treatment. (R. at 24-25.)

Turning to the medical source statements, the ALJ found Dr. Vaglica and Dr. Schwabish's opinions inconsistent with the weight of the record, including their own treatment notes, and thus granted them only partial weight. (R. at 26.) The ALJ gave sound reasons for doing so. Indeed, according to the medical source statements, Reid had little to no ability to interact with co-workers, supervisors, or the general public, and would be unable to perform reliably and consistently in a work environment. (R. at 389-95, 401-12.) However, the ALJ highlighted that Dr. Vaglica and Dr. Schwabish consistently found that Reid exhibited linear thought processes, an appropriate affect, coherent and goal-directed speech, intact memory, and good immediate recall and concentration. (R. at 24-25.) In addition, the ALJ pointed out that both Reid and the treatment notes reported that Reid's medication significantly reduced his symptoms. (R. at 24-25); see Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (per curiam) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). And though Reid would still, from

18

time to time, experience anxiety and intrusive thoughts from the alleged disabling event, Dr. Schwabish explicitly noted that "they occurred at a much lower level compared to when [Reid] first began therapy." (R. at 25, 466.)

In addition, the ALJ concluded that the medical source opinions were inconsistent with the range of daily activities that Reid performed. (R. at 25.) Specifically, the ALJ stated that, in light of the alleged symptoms and limitations, Reid's "daily activities are not as limited to the extent one would expect." (R. at 25.) For example, Reid reported that he is unable to be around others, but he also testified that he traveled from Virginia to New York by bus, sometimes alone, each month for psychiatric appointments; that he occasionally took his wife to her medical appointments; and that he attended night classes twice a week to help improve his reading ability. (R. at 25-26.) Furthermore, Reid's alleged symptoms also included PTSD and anxiety, but the ALJ noted that Reid's reported daily activities, such as exercising, gardening, and landscaping, "generally reflect a positive outlook and portray reduced mental symptoms." (R. at 25.) Of course, the ALJ did not conclude that Reid had <u>no</u> limitations in social functioning or daily activities. Indeed, he determined that Reid was moderately limited in both. (R. at 25.) However, according to the medical source statements, Reid had essentially no ability to interact with others or perform work-related mental activities, and the ALJ appropriately determined that Reid's reported activities were "clearly inconsistent" with such characterization of his limitations. (R. at 25-26.)

Given the well-documented history of Reid's improvement with treatment and medication as well as his self-reported activities of daily living, substantial evidence in the record supports the ALJ's conclusion that the medical source statements "overstate[d] the extent of [Reid's] limitations." (R. at 26.) Accordingly, the ALJ did not err in assigning them only partial weight.

Reid argues that in so doing, the ALJ failed to consider that, as Reid's treating physicians, Dr. Vaglica and Dr. Schwabish were entitled to greater deference in their opinions of Reid's impairments. Instead, according to Reid, the ALJ improperly grouped the medical source statements together and "cherry-picked" from the record in an effort to downplay the extent of Reid's limitations. (ECF No. 16, at 7-11.) These arguments are unpersuasive. While it is true that courts generally "accord greater weight to the testimony of a treating physician," Johnson, 434 F.3d at 654 (internal quotation marks omitted), that is not an absolute rule, Hines v. Barnhart, 453 F.3d 559, 563 n.2 (4th Cir. 2006). To the contrary, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590; see also 20 C.F.R. § 404.1527(c)(2) (noting that controlling weight will be accorded to treating source's medical opinion when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record).

As explained above, the ALJ expressly determined that the treating sources' opinions should be entitled only to partial weight because they were inconsistent with Reid's "mental status examination findings and treatment notes." (R. at 26.) And in so concluding, the ALJ did not, as Reid claims, pick and choose from the record. To the contrary, the ALJ discussed at length Reid's history with each of the treating sources, the frequency of treatment, the recorded progress of the treatment, including statements by Reid and observations by the treating sources, and Reid's reported daily activities. Accordingly, the ALJ appropriately considered all the relevant factors in weighing the opinions of Reid's treating sources.

Furthermore, the ALJ did not err in considering the medical source statements collectively. As stated above, five of the six opinions were authored by the same person, (R. at 389-95, 401-04,

407-08, 411-12), and three of those five were completed within one month of each other, (403-04, 407-08, 411-12). Aside from that, the medical sources opinions are essentially identical in their conclusions that Reid cannot perform appropriately in a work setting.[15] (R. at 389-95, 401-12.) Whether considered individually or collectively, the ALJ found that their overall conclusion did not comport with the weight of the record. He also articulated ample justification for his decision with citations to the record. The undersigned finds no error with the ALJ's consideration of the medical source statements.

**C.      Substantial Evidence Supports the ALJ's Conclusion that Reid's Impairments did not Meet or Medically Equal a Listed Impairment.**

Reid next argues that the ALJ mischaracterized evidence in the record so as to make Reid's impairments seem less severe when determining whether those impairments met or equaled a listed impairment. (ECF No. 16, at 12-16.) "The Social Security Administration has promulgated regulations containing 'listings of physical and mental impairments which, if met, are conclusive on the issue of disability.'" Radford v. Colvin, 734 F.3d 288, 291 (4th Cir. 2013) (quoting McNunis v. Califano, 605 F.2d 743, 744 (4th Cir. 1979)). A claimant is entitled to this conclusive presumption of impairment "if he can show that his condition 'meets or equals the listed impairments.'" Id. (quoting Bowen v. City of New York, 476 U.S. 467, 471 (1986)). To meet the requirements of a listing, a claimant "must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525(d). ALJs are obliged to explain their findings in sufficient detail to allow a court to determine if they were supported by substantial evidence. Radford, 734 F.3d at 291. A claimant for disability benefits under one of the listings

---

[15] Even Reid's counsel acknowledged this at the ALJ hearing: "I'm looking at the opinion statements and I note that there are actually several opinion statements that say essentially the same thing from the respective doctors." (R. at 62-63.)

21

must show she meets all criteria for that listing, and the burden is on her to demonstrate the same. See Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (citing SSR 83-19, 1983 WL 31248 (Jan. 1, 1983)[16]); Smith v. Schweiker, 795 F.2d 343, 346 (4th Cir. 1986).

Here, the ALJ considered three listings related to mental disorders, 12.04, 12.06, and 12.15, and concluded that Reid's impairments did not satisfy the criteria for any of them. (R. at 20-22.) Each listing consists of three paragraphs of criteria – paragraphs A, B, and C. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(A)(1)-(2), 12.04, 12.06, 12.15. Paragraph A includes the specific medical criteria that must be documented (i.e., the symptoms that must be present in the claimant). § 12.00(A)(2)(a). The criteria in paragraph B relate to how the symptoms limits the claimant's mental functioning in the following four areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. § 12.00(A)(2)(b). A claimant must establish that his mental disorder results in either "extreme" limitation[17] in one of the four areas or "marked" limitation[18] in two of the four areas. § 12.00(A)(2)(b). Finally, paragraph C includes criteria dealing with the seriousness and persistence of the mental disorder. § 12.00(A)(2)(c). To be sufficiently serious and persistent, the existence of the claimant's mental disorder must be medically documented for a period of at least two years, and there is evidence of both (1) ongoing medical treatment or mental health therapy that "diminishes the symptoms and signs" of the mental disorder, and (2) only

---

[16] SSR 83-19 has been rescinded in part to the extent it addressed the procedures used to determine disability in children. It otherwise remains an accurate representation of the Social Security Administration's policies and regulations. See SSR 91-7c, 1991 WL 231791 (Aug. 1, 1991).

[17] A claimant has extreme limitation when he is unable to function in the specified area "independently, appropriately, effectively, and on a sustained basis." § 12.00(F)(2)(e).

[18] A claimant has marked limitation when his ability to function in the specified area "independently, appropriately, effectively, and on a sustained basis is seriously limited." § 12.00(F)(2)(d).

marginal adjustment (i.e., the claimant has "minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life").  § 12.00(A)(2)(c), (G).

In order to meet or medically equal any of the listed impairments 12.04, 12.06, and 12.15, the claimant must satisfy either (1) the criteria of both paragraphs A and B, or (2) the criteria of both paragraphs A and C.  § 12.00(A)(1)-(2).  Because the three listings involve separate mental disorders, each of the three listings includes unique paragraph A criteria (with occasional overlap); however, the listings share identical criteria for paragraphs B and C.  Compare § 12.04(A), with § 12.06(A), and § 12.15(A).

In concluding that Reid's mental impairments did not satisfy the listed impairment requirements, the ALJ considered only whether Reid satisfied the criteria in paragraphs B and C. (R. at 20-22.)  Regarding the four areas of mental functioning in paragraph B, the ALJ determined that Reid had only moderate limitations in each.  (R. at 21.)  Regarding the paragraph C criteria, the ALJ concluded that Reid failed to satisfy the "marginal adjustment" requirement – that is to say that Reid had more than a minimal capacity to adapt to new demands or changes in his environment.  (R. at 21-22.)

Here, Reid challenges only the ALJ's evaluation of the paragraph B criteria.  Specifically, Reid argues that the ALJ "mischaracterized" the evidence in arriving at the conclusion that Reid suffered only moderate mental limitation in the areas of (1) understanding, remembering, or applying information, and (2) interacting with others. (ECF No. 16, at 13-14.)  With regard to the first area of mental functioning, Reid contends that it was error for the ALJ to consider his past semi-skilled work because his impairments did not arise until after the alleged 2011 disabling events and thus "his ability to perform semi-skilled work prior to his alleged onset date has no bearing on [Reid's] ability to perform that type of work after the onset date." (Id. at 13.)

23

Assuming arguendo that Reid is correct in this regard, the ALJ also based his conclusion that Reid had only moderate limitation in understanding, remembering, or applying information on the treatment notes' consistent findings that Reid exhibited intact concentration and memory. (R. at 21.) Furthermore, the ALJ's finding is further supported by other evidence in the record, chiefly Reid's statements both at the ALJ hearing and reflected in several medical appointments that he attended night classes twice a week. (R. at 46, 303, 328, 397, 417.) Accordingly, substantial evidence in the record supports the ALJ's moderate limitation finding in the first area of mental functioning.

Reid also argues that in concluding that Reid had moderate limitation in interacting with others, the ALJ improperly relied on evidence that Reid lived with and assisted his disabled wife and used public transportation to travel to New York for his medical appointments. (ECF No. 16, at 13-14.) According to Reid, his need to "travel[] six or seven hours on the bus" to attend medical appointments is a symptom of his impairment, not proof that he has less than marked limitation in interacting with others. (Id. at 13.) He also points out that he required the presence of his wife nearly anytime he was outside his home. (Id. at 13-14.)

The undersigned does not find that the ALJ improperly relied on evidence of Reid's activities in support of his conclusion regarding Reid's ability to interact with others. Indeed, it was entirely reasonable for the ALJ to conclude that Reid's ability to travel from Virginia to New York at least once a month via public transit and his ability to assist his wife with daily activities demonstrated that he had no more than a moderate limitation to interact with others. But, as above, that was not the only evidence in the record that the ALJ relied on in this conclusion. Indeed, the ALJ also highlighted that the treatment notes reflected that "he generally presented as alert, oriented, and cooperative" and contained no evidence of psychosis or delusional thoughts. (R. at

21.)  The undersigned concludes that the record contains substantial evidence to support the ALJ's finding that Reid had only moderate mental limitation in his ability to interact with others.[19] Accordingly, the undersigned finds no error in the ALJ's conclusion that Reid's mental impairments did not meet or medically equal a listed impairment.

## V. Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the court DENY Reid's Motion for Summary Judgment, (ECF No. 15), GRANT the Commissioner's Motion for Summary Judgment, (ECF No. 18), and AFFIRM the final decision of the Commissioner.

## VI. Review Procedure

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6 (a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an additional three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

---

[19] Reid also argues that had the ALJ granted more weight to Reid's treating sources' opinions, the ALJ would have found that Reid's impairments resulted in marked limitations for two or more of the paragraph B criteria.  (ECF No. 16, at 14-15.)  However, as the undersigned has already explained, the ALJ did not err in granting only partial weight to the medical source statements. Thus, Reid's argument in this regard lacks merit.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
November 1, 2019